## GOLDWYN PICTURES CORPORATION v. GOLDWYN.

(Circuit Court of Appeals, Second Circuit. January 7, 1924.)

### No. 218.

1. **Trade-marks and trade-names and unfair competition ☮40—One may deprive self of right to use own name in competitive business.**

   One by contract may deprive himself of the right to use his own name in a competitive business.

2. **Trade-marks and trade-names and unfair competition ☮40—Agreement not to use name in business must be supported by consideration.**

   In order that one may have a right to restrain another from the use of his own name in connection with a business because of a contract, that contract must be supported by a valid consideration.

3. **Appeal and error ☮954(1)—Trade-marks and trade-names and unfair competition ☮95(1)—Preliminary injunction discretionary.**

   The issuance of a preliminary injunction in suit for infringement of trade-mark and for unfair competition, which puts restraint on defendant before the rights of the parties have been fully investigated and determined, rests solely in the sound discretion of the chancellor, and, unless he abuses his discretion in granting or denying it, his action as a rule will not be reviewed on appeal, under Act March 3, 1891, § 7, as amended by Act June 6, 1900 (Comp. St. § 1121).

4. **Trade-marks and trade-names and unfair competition ☮95(2)—Court held not to have abused discretion in denying temporary injunction in form asked.**

   In a suit for infringement of a trade-mark and to enjoin the use by defendant of his own name, *held*, that trial court did not abuse its discretion in denying injunction pendente lite in the form asked by the plaintiff, which was that defendant be not permitted to use his name at all; the court permitting him to use it with suffix showing defendant not connected with plaintiff.

---

☮For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

5. **Trade-marks and trade-names and unfair competition** ⊚⇒67—**One without valid trade-mark may complain of another attempting to pass off goods.**

One who has no valid trade-mark may nevertheless complain of another, who attempts to pass off his own goods as goods of his rival; fraud being the basis of the complaint in such cases.

6. **Trade-marks and trade-names and unfair competition** ⊚⇒69—**No one has the right to injure the business of another through unfairness.**

No person has the right through unfairness, artifice, misrepresentation, or fraud to injure the business of another.

7. **Trade-marks and trade-names and unfair competition** ⊚⇒73(2)—**One should not use own name, so as to deceive public.**

One who was connected with a motion picture company using his name should so use his name in connection with his own business after severing relations with the company as to give notice to the public that the pictures he produces and sells or exhibits are not those of the company.

8. **Trade-marks and trade-names and unfair competition** ⊚⇒93(3)—**Defendant held not to have changed name with fraudulent intent.**

Evidence *held* not to show that one connected with Goldwyn Pictures Corporation, who changed his name from "Goldfish" to "Goldwyn," was actuated by any fraudulent intent to use the name "Goldwyn" after severing relations with company.

Appeal from the District Court of the United States for the Southern District of New York.

Action by the Goldwyn Pictures Corporation against Samuel Goldwyn. From an order granting a preliminary injunction giving insufficient relief, plaintiff appeals. Affirmed.

This cause comes here from the United States District Court for the Southern District of New York. The plaintiff is a corporation of the state of Delaware, with its principal office at Wilmington, in that state. The defendant is a citizen of the state of New York and a resident of the Southern district thereof. The jurisdiction depends upon diversity of citizenship, and upon the fact that the plaintiff is the owner of a trade-mark used by it in interstate commerce, which is registered in the Patent Office of the United States, which trade-mark it is alleged is being infringed by the defendant.

The plaintiff corporation is engaged in the manufacture and distribution of motion pictures, and its pictures have become widely known. It has represented in its motion pictures some of the best-known stars on the stage, as well as the literary work of some of the leading writers of to-day in England, France, and the United States. In the amended bill of complaint which the plaintiff filed it alleged that it and its predecessor in title had expended in the advertising and exploitation of its pictures in connection with the word "Goldwyn" in excess of $2,400,000. It is also alleged that the plaintiff has expended in the manufacture and exploitation of its pictures more than $20,-000,000, and that it has now invested in pictures not yet exhibited an excess of $2,500,000.

The plaintiff is the successor of a New York corporation also named Goldwyn Pictures Corporation, which was organized on November 22, 1916, and which in like manner was engaged in the production of motion pictures, and by a bill of sale executed on October 10, 1919, the Goldwyn Pictures Corporation (New York corporation) for a valuable consideration had bargained and sold and granted and conveyed to the Goldwyn Pictures Corporation, the Delaware corporation and plaintiff herein, its successors and assigns, "all of its assets of whatever kind, nature, and description, including the good will, outstanding accounts, trade-marks, trade-name, moving pictures, moving picture rights, contracts assignable, bank deposits, and cash on hand, and assets of all kinds, of whatever kind, nature, and description, both tangible and intangible, of the said corporation as of May 17, 1919, but expressly ex-

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

cluding that part or parcel of land located in Los Angeles, Cal., known as the 'Los Angeles Studio,' together with the fixtures, machines, and appurtenances relating thereto and excepting also the certain contracts held by this corporation and which are not assignable."

The New York corporation, the plaintiff's predecessor, on its incorporation began to produce motion picture films on a very large scale. It speedily became one of the most important motion picture concerns in the world, distributing its pictures not only throughout the United States, but throughout the balance of the world in which motion pictures are shown. On July 3, 1918, the New York corporation, the plaintiff's predecessor in title, applied to the Patent Office for the registration of "Goldwyn" as its trade-mark for motion pictures. Its application was granted on December 31, 1918, and there was issued to it certificate No. 123,995, which trade-mark is now the property of the plaintiff. In the statement which accompanied its application it alleged that it had used the trade-mark continuously in its business since January, 1917. But in the amended bill of complaint it is, however, alleged that "from the beginning, November, 1916, the name 'Goldwyn' has been continuously used by the plaintiff and its predecessor in intrastate, interstate, and foreign commerce as the trade-mark of this business and its products, and to this end this word has been physically applied to the films, which causes the name to appear on the screen in the introductory part of the films when exhibited, and also causes it to so appear frequently at the end of its pictures and in other ways."

The amended bill alleges that "by reason of the fact that the motion pictures produced by the plaintiff and its predecessor have become known to the public in connection with the name 'Goldwyn' there has grown up in the minds of the public, and especially in the minds of dealers, exhibitors, and theatergoers throughout the world, a very close and intimate association between the name 'Goldwyn' and the pictures which have been produced only by the plaintiff and its predecessor, and these persons now use, and for a long time past have customarily used, this name to identify and distinguish the pictures made only by the plaintiff and its predecessor. As a consequence, whenever the name 'Goldwyn' is used in connection with a motion picture, whether alone or in conjunction with other words, it signifies and by reason of the facts herein set forth can only signify, not motion pictures produced by a person named 'Goldwyn,' but that such picture is one of the pictures produced only by the plaintiff or its predecessor, in which meaning the public has for a long time acquiesced, and it now recognizes and respects the sole and exclusive right of the plaintiff to the use of the name 'Goldwyn' in connection with motion pictures."

The incorporators of the New York company created the name "Goldwyn." It appears that one of the incorporators of that company was Samuel Goldfish, who afterwards changed his name to Samuel Goldwyn, the defendant herein. The incorporators of that company gave it the name "Goldwyn" by combining the first syllable of the name of Samuel Goldfish with the last syllable of the name of Edgar and Archibald Selwyn, who were also incorporators. The amended bill sets up an agreement made between the plaintiff and the defendant on October 10, 1919, in which it was agreed as follows:

"That the party of the first part does engage and employ the party of the second part to act as an executive in its business for a period of three years from the date hereof, to perform such duties as are generally performed by individuals occupying similar positions in corporations engaged in the same or similar lines of work as is the party of the first part. For said services the party of the first part hereby agrees to pay to the party of the second part the sum of fifty-two thousand dollars ($52,000) per annum, payable in equal weekly installments at the end of each and every week. The party of the second part accepts the said employment hereunder, and agrees to devote his whole time, energy, skill, and attention to the services of the party of the first part, and that he will devote such time to the services of the party of the first part exclusively, and will not be engaged in any other employment, business, occupation, or calling. The party of the second part herewith agrees that for a period of three years from the date hereof he will not, directly or indirectly, be engaged or interested in any other motion.

picture enterprise, either as principal, agent, employer, employee, officer, director, or stockholder, excepting the interest which he now has as a stockholder in the Famous Players-Lasky Corporation, and also excepting the interest of the party of the second part in the Alhambra Theatre, Philadelphia, Pa. The party of the second part, in consideration of the above premises, and in further consideration of the sum of one dollar in hand paid, the receipt whereof is hereby acknowledged, and as a part of the agreement, to which he was a party signatory, dated July 28, 1919, and relating to the formation of this corporation, does hereby sell, assign, set over, transfer, and convey to the party of the first part all right, title, and interest which the party of the second part now has in and to any motion picture interests of any kind, nature, and description, and whether the said right, title, and interest be tangible or intangible, expressly excepting the interest which the party of the second part now has in the Famous Players-Lasky Corporation and the Alhambra Theatre, Philadelphia, Pa."

The amended bill of complaint alleges that on October 22, 1920, the plaintiff and defendant entered into a contract in which the defendant gave to the plaintiff the exclusive use of the name "Goldwyn." The contract of October 22, 1920, states expressly that the agreement of October 10, 1919, "hereby is canceled and rescinded as of the 11th day of October, 1920, and that each of the parties are hereby released and discharged from all obligations and liabilities thereunder, with like force and effect as if the agreement had never been made, except that the assignment and conveyance therein in the last paragraph contained shall in no wise be affected, and shall remain in full force and effect." This reference to the part which was to remain in full force and effect was the agreement of the defendant Goldwyn that he sold, transferred, and conveyed to the plaintiff all right, title, and interest which he at the time had "in and to any motion picture interests," excepting his interest in the Famous Players-Lasky Corporation, and the Alhambra Theatre, Philadelphia, Pa."

The amended bill of complaint charges that in March, 1922, the defendant ceased to be the president of the plaintiff corporation, although he continued a member of its board of directors and one of its voting trustees. It alleges that in the latter part of the year 1922 the defendant began business on his own account as a producer of motion pictures, and that "he has now completed and has announced that he is about to offer to exhibitors a picture entitled 'Potash and Perlmutter,' which picture is now being advertised under the identical introductory phrase heretofore used by the plaintiff, namely, 'Samuel Goldwyn presents.'" In his answer the defendant denies that he is a "member of the board of directors, and alleges that he resigned on September 5, 1923, and that said resignation was duly accepted on September 28, 1923; and he further denies that shortly after he ceased to be an officer of the plaintiff he began business on his own account as a producer of motion pictures in competition with the plaintiff, and has announced that he is about to offer to exhibitors a picture entitled 'Potash and Perlmutter,' which picture is now being advertised under the identical introductory phrases heretofore used by the plaintiff, 'Samuel Goldwyn presents.'"

In the affidavit of the secretary of the plaintiff corporation in support of the bill and the application for the injunction it is stated that, some months after the defendant ceased to be president of the plaintiff corporation, he "began business as a producer of motion pictures on his own account, and has actively been engaged therein since that time." "He has now completed and is about to begin the distribution of a picture entitled 'Potash and Perlmutter.' This picture has been advertised in numerous magazines and newspapers, has already been produced for private audiences, and will be distributed and produced in the usual course within the next few weeks. * * * Defendant is conducting this business under the name 'Samuel Goldwyn,' and the business is referred to in the public press as 'Samuel Goldwyn' or 'Goldwyn'; the latter being the identical name by which the plaintiff is nationally referred to in the public press and is known the world over." "Deponent is informed by persons who have seen the production of the picture 'Potash and Perlmutter, that this picture is introduced on the screen with the phrase 'Samuel Goldwyn presents,' the identical phrase which the

defendant caused to be used in presenting numerous pictures of the plaintiff during the year 1919, and which are still being exhibited." "Defendant is causing his picture 'Potash and Perlmutter' to be widely advertised under such phrases as 'Samuel Goldwyn presents,' 'Samuel Goldwyn, Producer,' and other phrases using the word 'Goldwyn.'" "Deponent has read repeated references to plaintiff's and defendant's pictures in newspapers and trade papers, and both plaintiff's and defendant's pictures and the production activities of both plaintiff and defendant are referred to as 'Goldwyn' or 'Goldwyn's,' and it is evident to any one reading such references that, unless the relief herein prayed for be granted, it is inevitable that both plaintiff and defendant will be referred to as 'Goldwyn' and constantly confused. Numerous announcements of the defendant's forthcoming production of 'Potash and Perlmutter' appeared in magazines." The affidavit sets forth a number of the advertisements of the moving pictures which the defendant it is said is proposing to exhibit and to use his own name in connection therewith.

The record contains a letter dated July 16, 1923, addressed to the defendant, calling the latter's attention to advertisements appearing in the Moving Picture News, of July 7, 1923, in which the picture of "The Eternal City" is mentioned as presented by "Samuel Goldwyn" and "Potash and Perlmutter" is announced as "produced by Samuel Goldwyn." In this letter the defendant's attention is called to the contract of October 22, 1920, in which he had confirmed the plaintiff's exclusive right to the use of the name "Goldwyn" and agreed not to use or permit the use of the name in any manner competitive to the plaintiff's corporation. The defendant's reply to this letter is in the record and is dated July 20, 1923. In it he writes: "I disagree entirely with your claim that by reason of the instrument to which you refer I have not the right to use my name, Samuel Goldwyn, in connection with pictures which may be produced by me."

The amended bill alleges as follows: " * * * Plaintiff is informed and believes, and therefore alleges, that the said picture 'Potash and Perlmutter' has already been exhibited, and that the introductory part of the same contains the words 'Samuel Goldwyn presents.' Plaintiff is informed and believes, and therefore alleges, that defendant has in course of manufacture another motion picture which he is about to produce, entitled 'The Eternal City' which will be ready for production in the near future. Plaintiff is informed and believes, and therefore alleges, that the aforesaid acts of the defendant complained of inevitably will cause the pictures made and offered by the defendant to be passed off as and for pictures made and offered by the plaintiff, and will cause serious confusion in the minds of the theater-going public, inducing them to attend showings of the defendant's pictures under the false impression that the pictures are made and offered by the plaintiff, and that already the defendant's pictures have been confused with plaintiff's, and vice versa, all to the profit of the defendant and the serious and irreparable damage of the plaintiff." And an injunction was prayed, enjoining the defendant from using or permitting others to use the name "Goldwyn" in connection with the motion picture business.

The bill asks for an accounting for all profits and for damages. A great part of the plaintiff's amended bill is alleged upon information and belief, and many of its allegations are specifically denied in the defendant's answer. The cause came on to be heard upon a motion for a preliminary injunction. Affidavits were presented in behalf of the plaintiff, as well as in behalf of the defendant. The court granted an injunction the terms of which are set forth in the opinion. The plaintiff has brought the matter to this court on appeal.

Harry D. Nims, of New York City (Phillip W. Haberman and Joseph M. Hartfield, both of New York City, of counsel), for appellant.

Stanchfield & Levy, of New York City (Frederick Collin, of Elmira, William M. Parks, and J. Arthur Leve, of New York City, of counsel), for appellee.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). This is a suit for the infringement of a trade-mark. The plaintiff has sought and obtained an injunction pendente lite restraining the defendant from using the name "Goldwyn" on any moving picture films, advertisements, or other displays to be shown to the public, unless in all cases it be followed by the words "not now connected with Goldwyn Pictures." And it is added that such suffix is "to be in as large and of as prominent type and of the same color as the word 'Goldwyn,' and to be so spaced and spread as to be as noticeable as that word." The injunction granted falls short of what the plaintiff sought, as he prayed the court to restrain the defendant from in any manner using or permitting others to use the name "Goldwyn," or any term or phrase embodying it in any business which may be confused with that of the plaintiff. The plaintiff, therefore, is not satisfied with the injunction in the form in which it was granted, and asks this court to remand the case with directions to grant a preliminary injunction as prayed. The defendant has not appealed.

The plaintiff is engaged in the production of motion pictures, and as such has an established reputation with the public throughout the United States. It and its predecessor in title have produced pictures representing an investment of more than $20,000,000. The defendant has been engaged in the motion picture business since 1913, when the business was in its infancy. He was connected, not only with the plaintiff, but with its predecessor in title, and has been closely identified with the largest producing organization of moving pictures in the world. So valuable were his services considered to be that for several years he was paid a salary of $52,000 annually as president of the plaintiff corporation. His name is perhaps as well known in the motion picture business as that of any other man. Since he severed his official connection with the plaintiff, he has been engaged in the production of motion pictures on his own account, and has used his own name in connection therewith. The plaintiff is objecting to the use of his name in connection with the pictures which he produces, and claims that he is without right to do so, and that his conduct in doing so will create the most widespread confusion in the minds of the public, and the most disastrous and damaging consequences to the plaintiff, which advertises its pictures as "Goldwyn Pictures." It alleges that the defendant's use of his name makes it easy for persons intending so to do to pass off defendant's business as and for plaintiff's business, and defendant's pictures as and for plaintiff's pictures, and misleads and deceives persons having no intent or purpose to confuse the two into so doing.

The defendant, in an answering affidavit submitted to the District Court, says:

"I am just as anxious to prevent any one from thinking that my pictures were produced by the Goldwyn Pictures Corporation as the plaintiff in this action can possibly be. I do, however, regard it as vitally important to me to be allowed to use my own name, if I am to continue in the motion picture business with any prospect of success. If I cannot hold myself out as the person engaged in the business, and make my own contracts with actors, authors, directors, and others, register copyrights in my own name, make contracts for distribution, and make such legitimate use upon the screen and in

advertising and other publicity of the fact that the person carrying on the business and making the pictures is myself, Samuel Goldwyn, it will be almost impossible for me to conduct my business, and, if I succeed in carrying it on, I will be greatly hampered and financially embarrassed. This is particularly true because my plan of business involves the production of a small number of photoplays of extremely high grade, all of which are to receive my personal attention, and it is necessary to make that fact clearly appear at all times."

It has sometimes been said that the right of a man to use his own name in his own business is one of his natural and inalienable rights. Thus in Hilton v. Hilton, 89 N. J. Eq. 182, 104 Atl. 375, L. R. A. 1918F, 1174, the New Jersey Court of Errors and Appeals, in 1918, said that:

"The right of a man to use his own name in his own business is part of the natural and inalienable rights guaranteed by the very first clause of our Constitution, without which the right to acquire, possess, and protect property would be of little worth. Although the right is not safeguarded in England by any constitutional guaranty, it has found careful protection in the courts of justice."

And it was said:

"The right to make known that one is in business by advertising addressed to the public generally is a necessary concomitant of the right to do business, without which that right would be hardly more than nominal."

In the above case the court held that an injunction should be modified which enjoined the defendant from using his name, "Hilton," either alone or in association with other words in any clothing business competitive with the clothing business conducted by the complainant trading under the name of "the Hilton Company." The plaintiff and defendant had the same surname, and had been partners in the clothing business, but had dissolved the partnership. The defendant had retired from the partnership, and had transferred to the complainant "all the name and good will" of the business, and it was held that this did not in itself prevent the defendant from engaging in business in competition with the plaintiff.

[1] We have no doubt that one by contract may deprive himself of his exclusive right to use his name in industry. In Brown Chemical Co. v. Meyer, 139 U. S. 540, 542, 11 Sup. Ct. 625, 626 (35 L. Ed. 247), Mr. Justice Brown, writing for the court, calls attention to the fact that "cases are not wanting of injunctions issued to restrain the use even of one's own name, where a fraud upon another is manifestly intended, or where he has assigned or parted with his right to use it." And we do not understand that in Hilton v. Hilton it was intended to assert that one might not by contract part with his right to use his own name in a competitive business. In the instant case the plaintiff and defendant entered into a contract or agreement dated October 22, 1920, which contained the following provision:

"The party of the second part [the defendant] recognizes and confirms to the party of the first part the exclusive right to use the name 'Goldwyn,' and agrees that he will not use or permit the use of 'Goldwyn,' either directly or indirectly, neither alone nor in connection with or as part of any name or title, in any motion picture enterprise, or in any manner competitive to the corporation, or in the manufacture, exploitation, or presentation of motion pictures."

The plaintiff claims that because of this agreement the defendant has no right to the use of his own name, Samuel Goldwyn, in connection with any motion picture or motion picture enterprise, or in any manner competitive to the plaintiff. But it is claimed that this agreement of October 22, 1920, is not supported by a consideration, and it is also claimed that even if the agreement be valid the restrictive covenant does not extend beyond the term of the contract, and that it came to an end on October 10, 1922.

It appears that after October 10, 1922, and in the spring of 1923, the defendant entered into a contract with the Associated First National Pictures, Inc., a corporation also organized under the laws of Delaware, for the distribution of pictures to be manufactured by him. It is one of the largest motion picture distributing concerns in the United States, and its stockholders are owners of motion picture houses in what are known as the key cities of the United States. The defendant is not an officer of that corporation and holds none of its stock. By virtue of his contract the defendant is to lease to that corporation two complete negatives and two sample positive prints of a picture he has manufactured or produced known as "Potash and Perlmutter," upon the payment by that company of the actual cost of production, not exceeding $250,000, as an advance payment on account of the defendant's share of the gross receipts to be derived through such motion pictures. The contract provides for the apportionment between the company and the defendant of the gross receipts arising from the exhibition of the picture. The contract gives to the company "the exclusive, sole, and complete right, without let or interference by the defendant or any third party, to distribute the picture throughout all the countries and parts of the world for seven years," and the company agreed so to distribute such picture. It agreed to announce the defendant as the manufacturer or producer of the picture and that it was First National Picture, and upon the film in all printing, advertising, publicity, and billing matter should be, in the form stated, "Samuel Goldwyn Presents 'Potash and Perlmutter,' * * * a First National Picture."

It is the above agreement which the defendant has made with the First National Pictures, Inc., which led to the bringing of this suit by the plaintiff and its application for the injunction it now seeks. The plaintiff, in bringing this case here on appeal, has assigned 18 errors, the first two of which are as follows:

"(1) The court erred in refusing to grant a preliminary injunction against any use of the name 'Goldwyn' by defendant in the moving picture business as prayed in the bill of complaint.

"(2) The court erred in finding and holding that there was no consideration for defendant's undertakings contained in paragraph marked '1' of the agreement of October 22, 1920."

[2] In order that the plaintiff may have a right to restrain the defendant from the use of his own name in connection with the motion picture business because of a contract, that contract must be supported by a valid consideration. If that so-called contract was without valid consideration, a right based upon it fails. The District Judge, in his opinion, referring to the consideration for this contract, said:

"That question can be finally decided only after a hearing, but on this motion I must take all disputed issues in the defendant's favor. It is agreed that on September 2, 1920, the defendant resigned as president of the plaintiff, a position which for the last 11 months he had held under the contract of October 10, 1919. That contract did not, it is true, expressly give him the position—he was engaged only as 'an executive'—but I think the construction of the parties very clearly indicates in what sense the word was used. The contract imposed upon him the duties, and gave him the powers, usually pertaining to the office. Goldwyn's version is that he resigned because negotiations were on foot with Du Pont, who was to advance new money and who would not have him president if he did. I can find no suggestion that his resignation was made subject to his right to resume his position later. Therefore he released the plaintiff from one of its obligations and himself from the duties which it involved. The negotiations with Du Pont fell through, and, as he says, the directors appealed to him to raise the money elsewhere. In this he succeeded, and it was at a conclusion of his efforts that the contract of October 22, 1920, was signed. He was then re-elected as president.

"It is quite apparent that if the contract was made in consideration of his getting back his position, there was a valid consideration, because, even though the directors remained free to impose on him all those duties which he had formerly discharged, it was a legal detriment to the plaintiff to restore him to his office, because the plaintiff was not then legally bound to do so. Moreover, the enjoyment of the title may well have had other than pecuniary attractions to the defendant. However, in his affidavit of October 3, 1923, he denies that his re-election was made on condition that he sign the contract of October 22, 1920. He says that, on the contrary, it was agreed to make him president because that was a condition imposed by those who promised to furnish the new money. There had been no question raised of the use of his own name in an independent business up to that time.

"If these be the facts, I think it very difficult to find any consideration for the restrictive covenant, assuming, as I do, that he is charged with notice of it. If he were once unconditionally installed as president under the old terms, the plaintiff suffered no detriment in executing the contract of October 22, 1920, It is true under this second contract he was not necessarily subject to all the duties he had assumed before, but that depended upon the will of the directors, who reserved to themselves the right to call upon him to perform any duties 'as shall be appropriately assigned to him' by them. This means that they could have required of him all that he was bound to do under the contract of October 10, 1919. In other respects the contract was the same as before, including the time of its duration. The plaintiff has not pointed out to me any detriment which it assumed, if this version be true. So much for the original affidavits.

"The new affidavits do not change the situation. Whatever may in the end prove to be the force of the evidence they contain, the defendant's denials are repeated, and still go to the critical issue of the case. It is clear that the issue is not so plain as to be taken against the defendant on a motion of this kind, and it must be disposed of on the supposition that the covenant, which would otherwise have entitled the plaintiff to an absolute injunction, was nudum pactum."

[3] The issuance of a preliminary injunction, which puts restraints upon the defendant before the rights of the parties have been fully investigated and determined, rests solely in the sound discretion of the chancellor, and unless he abuses his discretion in granting or denying it his action as a rule will not be reviewed on appeal. Clark v. Wooster, 119 U. S. 322, 325, 7 Sup. Ct. 217, 30 L. Ed. 392; Buffington v. Harvey, 95 U. S. 99, 100, 24 L. Ed. 381; New York Grape Sugar Co. v. American Grape Sugar Co., 10 Fed. 835, 20 Blatchf. 386; Edison Electric Light Co. v. Buckeye Electric Co. (C. C.) 64 Fed. 225.

Formerly the granting of an injunction was in the absolute discretion of the primary court, and its action was not reviewable by appeal. Kerr v. City of New Orleans, 126 Fed. 920, 924, 61 C. C. A. 450. But the Act of March 3, 1891, allowed an appeal from such a decree. 26 Stat. 826, § 7. It was amended by the Act of June 6, 1900, c. 803, 31 Stat. 660 (Comp. St. § 1121). But since the passage of the act the courts have held that the granting of an injunction pendente lite is in the sound judicial discretion of the trial court, and will not be disturbed on appeal unless it is violative of the rules of equity established for the guidance of its discretion. The same thing is sometimes expressed in another way by saying that the action of the trial court will not be reversed, unless there has been an abuse of discretion. And it is sometimes said that such action will not be reversed, unless it clearly appears that the injunction was improvidently allowed. In Meccano, Limited, v. John Wanamaker, 253 U. S. 136, 141, 40 Sup. Ct. 463, 465 (64 L. Ed. 822), the Supreme Court declared:

"The correct general doctrine is that whether a preliminary injunction shall be awarded rests in the sound discretion of the trial court. Upon appeal, an order granting or denying such an injunction will not be disturbed, unless contrary to some rule of equity, or the result of improvident exercise of judicial discretion."

See City of Amarillo v. Southwestern Telegraph & Telephone Co., 253 Fed. 638, 165 C. C. A. 264.

[4] It seems to us too plain for argument that, so far as the right to an injunction in this case rests upon the so-called contract of October 22, 1920, there has been no such abuse of the trial court's discretion in denying the injunction in the form asked for, in so far as the right to it depended upon the agreement above referred to. The court, in granting the motion for the preliminary injunction, did so to the following extent, and not otherwise:

"* * * The defendant, until further order of this court, is hereby enjoined from using the name 'Goldwyn' on any moving picture films, advertisements, or other displays which are to be shown to the public, unless in all cases it be followed by the words 'not now connected with Goldwyn Pictures'; such suffix to be in as large and of as prominent type and of the same color as the word 'Goldwyn' and to be so spaced and spread as to be as noticeable as that word."

And the court in its order stated that the preliminary injunction was granted upon plaintiff filing a bond in the sum of $5,000. The court further stated:

"In all other respects the said motion [for the temporary injunction] is hereby overruled."

The prayer of the amended bill of complaint was as follows:

"That an injunction issue herein, during the pendency of this suit and perpetually thereafter, restraining and enjoining the defendant, his agents, distributors, associates, representatives, and employees, and all those in privity with him, from in any manner using or permitting others to use the name 'Goldwyn,' or any colorable imitation thereof, or any term or phrase embodying the said name, or any name colorably similar thereto, in connection with the manufacture, advertising, exploitation, distribution, or presentation of motion pictures, films, or in any business which may be confused with that of plaintiff, to its damage through the confusion of the public."

The court, it will be observed, declined to restrain the defendant from in any manner using or permitting others to use the name "Goldwyn," or any colorable imitation thereof, or any term or phrase embodying the same name, or any name colorably similar thereto, in connection with motion pictures in the manner and to the extent which the plaintiff asked. In other words, the court in effect has declined at this stage of the proceeding to recognize that a right exists in the plaintiff, based upon the alleged contract, to restrain the defendant absolutely from using his own name in any manner in connection with the motion picture business. If this was error at all, it was not so clearly error as to justify this court at this time in reversing the court below.

This brings us to a consideration of the trade-mark which the plaintiff claims, because of its registration of the term "Goldwyn" in the United States Patent Office. The argument in this court was in the main based upon the alleged contract right—although it was asserted that the plaintiff has a valid and subsisting trade-mark, which the defendant is infringing; and it is said that the plaintiff's right in its trade-mark rests upon section 5 of the Trade-Mark Act of February 20, 1905, c. 592, 33 Stat. 724 (Comp. St. § 9490). That provided that:

"No mark which consists merely in the name of an individual, firm, corporation, or association * * * shall be registered under the terms of this act: Provided, further, * * * that nothing herein shall prevent the registration of any mark used by the applicant or his predecessors. or by those from whom title to the mark is derived, in commerce with foreign nations or among the several states, or with Indian tribes, which was in actual and exclusive use as a trade-mark of the applicant or his predecessors from whom he drived title for ten years next preceding the passage of this act."

The plaintiff's predecessor in title was organized in 1916, and prior to that time the word "Goldwyn" is thought not to have existed, so that the 10-years clause above quoted has no application to his trademark, which was used as such until after the act was passed. The registration of the word "Goldwyn" as a trade-mark was not discussed in the opinion by the District Judge, and we see no reason to discuss it in this court at this time.

[5-7] The plaintiff also relies upon unfair competition. One who has no valid trade-mark may nevertheless complain of another who attempts to pass off his own goods as the goods of his rival. Fraud is the basis of his complaint in such cases. The court acts to promote honesty and fair dealing, and because no one has a right to sell his own goods as the goods of another. The court seeks to protect the purchasing public from deception and also the property rights of the complainant. It protects the owner of a business from a fraudulent invasion of his business by somebody else. No person has the right through unfairness, artifice, misrepresentation, or fraud to injure the business of another. The defendant must so use his name in connection with his business as will give notice to the public that the pictures he produces and sells or exhibits are not those of the plaintiff; and it does not appear to us, at least upon the present state of the record, that the preliminary injunction which has been issued does not afford to the plaintiff all the protection to which it is entitled at this stage of the case. It is not an unusual thing for a plaintiff in suits of this nature to

attempt to obtain by a preliminary injunction the relief to which he is entitled only after a full hearing on the merits. This court does not look with favor upon attempts of this nature.

[8] Before concluding this opinion, it may be proper to say that the record now before us does not disclose that the defendant, in changing his name from Goldfish to Goldwyn, was actuated by any fraudulent intent. The defendant in his affidavit states:

"In 1918 the Selwyns [associated with him in the Goldwyn Pictures Corporation] suggested to me that for several reasons it would, be advisable in the interest of the corporation that I change my name to Samuel Goldwyn; that, because of the war, a name indicating Teutonic origin was a detriment; that a good many people already thought my name was Goldwyn, and considerable mail was being received by the company addressed to Samuel Goldwyn; that I had a reputation in the industry, and was identified in the trade and with the public as a successful producer of high-class motion pictures; and that the value of my reputation and my name to the corporation would be increased by making the change in my name as suggested. I stated, in effect, that it would be a sacrifice for me to give up a name which I had established and made well known, and that I did not care to submerge my identity in that of the corporation. They suggested, however, that if the Goldwyn Company followed the same form of advertisement that had been used in the past by announcing the name of its president my identity would not be lost, and that at the same time the corporation would be benefited. Accordingly I decided to carry out Mr. Selwyn's suggestion, and applied for and received from the court on order changing my name to Samuel Goldwyn. All of the things which I was required by that order to do as conditions of the change in name were duly performed, and the change in my name has been in full effect as provided in that order since January, 1919."

The affidavit of the two Selwyns, who with the defendant organized the New York corporation of the Goldwyn Pictures Corporation, the plaintiff's predecessor in title, amply sustain Goldwyn's statements as to the reason for the change that was made. Edgar Selwyn in his affidavit states that he and his brother made the suggestion to the defendant to make the change and he states their reasons for doing so. He says:

"My brother and I suggested to Goldfish that he change his name and advertise it broadly throughout the country."

He adds:

"There never was any intention at any time on the part of any of us that Samuel Goldwyn should be deprived of the use of his name, and it was only because we urged upon him the necessity of taking the name of Samuel Goldwyn rather than Samuel Goldfish that the latter consented so to do."

And Archibald Selwyn in his affidavit says:

"* * * In the latter part of 1918 I discussed the advisability of having Mr. Goldwyn change his name. In view of the large business that the Goldwyn Pictures Corporation was doing with the allied countries, we came to the conclusion that it would be advisable for Mr. Goldwyn to give up the name Goldfish and adopt legally the name Goldwyn. My brother and I urged Mr. Goldwyn so to do. There was no intention or understanding on the part of any of us that Mr. Goldwyn was not to have the right to use the name Samuel Goldwyn, if at any time he should sever his connections with that corporation. Upon the strength of our suggestion and advice to him, Mr. Goldwyn changed his name."

There is a general rule that every one has the absolute right to use his own name honestly in his own business for the purpose of advertising it, even though he may thereby incidentally interfere with and injure the business of another having the same or a somewhat similar name. In such cases, as was said in Russia Cement Company v. Le Page, 147 Mass. 206, 209, the inconvenience or loss to which those having a common right to it are subjected is damnum absque injuria. But, as we have already said, one may by contract surrender his right to use his name in connection with his business. The question whether this defendant has surrendered this right has not been determined in the court below, and is not before us at this time.

Order affirmed.