SCHILLING GRAIN CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 5939. Promulgated October 29, 1927.

1. Where the respondent in determination of a deficiency allowed a deduction representing a commission incurred and paid by a corporation to its president for the negotiation and sale of the corporation's business and certain of its assets and the respondent in his answer alleges that he erroneously allowed such deduction, *held* that the burden of proof is on respondent to show that the deduction is not allowable.

2. An amount allowed by respondent as a commission paid by a corporation to its president for the negotiation and sale of corporation's business and certain of its assets held to be deductible.

3. Value of good will on March 1, 1913, determined.

4. Where good will was acquired without cost prior to March 1, 1913, and it together with other assets thereafter was sold as one transaction, the value of the good will at March 1, 1913, should be considered in determining the taxable gain or deductible loss from the transaction.

*Samuel A. Dew, Esq.*, for the petitioner.
*John D. Foley, Esq.*, for the respondent.

This is a proceeding for the redetermination of a deficiency of $4,380.47 for 1920. The deficiency results from the respondent's refusal to include an amount of $10,560.60 as the value of good will on March 1, 1913, in determining the profit on the sale by the petitioner of its business and assets.

At the hearing the respondent amended his answer so as to allege that a deduction of $4,500 taken by the petitioner as a commission had been erroneously allowed in the determination of the deficiency.

### FINDINGS OF FACT.

The petitioner is a Missouri corporation organized in 1905 with its principal office at Kansas City.

In 1886, C. H. Schilling opened a feed and seed business in the " West Bottoms " section of Kansas City, Mo. Schilling bought feed and grain and sold it to transfer companies, livery stables, retail feed stores, dairies and similar businesses in wagon-load lots or less. Solicitors were employed to obtain orders. About 1890 state regulations made it advisable to acquire a warehouse and a weighing machine, both of which were acquired.

About 1889, Schilling took his son, H. J. Schilling, into the business, which thereafter operated under the name of C. H. Schilling & Son. The general nature of the business remained the same. In 1898, the elder Schilling died and the business was conducted by the son.

In 1905, the business was incorporated under the name of the petitioner. The company acquired title to a part of the real estate where its warehouse was located and leased a part of the real estate. The equipment owned and used by the company in the operation of its business consisted of horses, mules, wagons, buggies, machinery for grinding feed, a shop, elevators, and various other kinds of machinery of similar character. The company continued to conduct a local grain and seed business, supplying the class of trade it had theretofore served. Sales were made in amounts ranging from 10 cents upward to the company's customers, who ran into the hundreds

and were located principally in Jackson and Clay Counties, Missouri and Wyandotte County, Kansas. Jackson County includes Kansas City, Mo., a number of small towns, an area of good farming country and towns to the north, while Wyandotte County includes Kansas City, Kans., and farming country and towns west and north. Practically all deliveries could be made by truck or wagon and were within a radius of from 10 to 20 miles of Kansas City. Shipments by rail were infrequent and of little importance, since this class of business was not solicited. H. J. Schilling personally had membership on the board of trade at Kansas City, Mo., through which he made purchases for the Schilling Grain Co. as its needs required. Under the rules of the board of trade such membership had to be held individually and could not be transferred to a corporation or a partnership.

Early in 1920 the petitioner through H. J. Schilling, its president, entered into negotiations for the sale of its business and certain of its property. These negotiations resulted in the execution on April 20, 1920, of an agreement whereby C. C. McConnel and V. R. Miller were given an option for 30 days to purchase certain property of the company. The option was exercised and as a result the following agreement was entered into:

THIS AGREEMENT, made and entered into this 19th day of May, 1920, by and between HENRY J. SCHILLING and SCHILLING GRAIN COMPANY, a corporation, parties of the first part, and V. R. MILLER and CHARLES C. McCONNEL, parties of the second part, WITNESSETH:

For and in consideration of the sum of Thirty Thousand ($30,000.00) Dollars, payable as follows: Five Thousand ($5,000.00) Dollars on June 1st, 1920; Ten Thousand ($10,000.00) Dollars on the first day of October 1920; Ten Thousand ($10,000.00) Dollars on the first day of October, 1921, and Five Thousand ($5,000.00) Dollars on the first day of October, 1922, the parties of the first part agree to sell, transfer and deliver to the parties of the second part on October 1st, 1920, the following described property, real, personal and mixed, being situated in the County of Wyandotte, State of Kansas, to-wit:

Forty-eight (48) feet of ground and all buildings thereon, legally known and described as Lots Fifty-Two (52) and Fifty-four (54), in Ewing Street Addition in and to Kansas City, Kansas; also the lease now held by the parties of the first part on the ground and building known as No. 29 to 35 Ewing Street, Kansas City, Kansas; all of the machinery, mill and elevator equipment, spouts, furniture, fixtures and office equipment, platform and wagon scales, one Ford Motor Car, all teams and wagons, harness and delivery equipment in and about aforesaid buildings belonging to the Schilling Grain Company, a corporation organized and existing under the laws of the State of Missouri, together with the good will of the business of the Schilling Grain Company aforesaid (it being understood, however, that this does not carry with it to the parties of the second part the right to operate under the name of Schilling Grain Company); all of the machinery, tools and equipment aforesaid to be delivered to the parties of the second part in first class working condition. All of the property above set out, which is not conveyed by deed or assignment of lease to be set out in an inventory hereto attached and made a part thereof.

It is further agreed by and between the parties hereto that should any damage result to the property above set out by reason of fire, flood, storm, riot, act of God or the public enemy, which would materially impair or interrupt the business to any great extent between the signing of this contract and the first day of October, 1920, then this contract and the obligation on the part of the parties of the second part shall cease and determine. Should damage result from any cause to the machinery, horses, wagons, automobiles, or other equipment, which would not necessitate an interruption of the business, then adjustment shall be made by and between the parties hereto based upon the inventory hereto attached.

Parties of the first part hereby agree to employ W. R. Miller, one of the parties of the second part, from and after the first day of July to the 30th day of September, 1920, at a salary of Two Hundred Dollars per month, and agree to familiarize him in every respect with the business of the Schilling Grain Company, and acquaint him as far as possible with all of its customers.

Parties of the first part agree that in the event that this contract becomes terminated by reason of any of the provisions hereof before October 1st, 1920, and the delivery of said property together with proper conveyance and transfer thereof to the parties of the second part, then the Five Thousand ($5,000.00) to be paid by the parties of the second part to the parties of the first part on June 1st, 1920, shall be refunded and repaid to the said parties of the second part.

The parties of the first part agree that they will not enter into the wholesale or retail feed and seed business within the confine of the limits of Jackson and Clay Counties, Missouri, and Wyandotte County, Kansas, for a period of two years from the date of the transfer of said property to the parties of the second part. Nothing herein contained, however, shall be construed to prevent said first parties or either of them from operating on the Board of Trade of Kansas City, Missouri and from conducting the usual Board of Trade business, or from entering the hay business.

Parties of the first part agree that they or each of them will not employ any of the present employees of the Schilling Grain Company within a period of six months from October 1st, 1920, without the written consent of the parties of the second part.

It is agreed by parties of the first part that if for any reason the owners of the building and ground now occupied by the Schilling Grain Company at 35 Ewing Street, Kansas City, Kansas, will not consent to an assignment of the present lease, then this contract shall become null and void.

It is also agreed by parties of the first part that the business of Schilling Grain Company between June 1st and October 1st, 1920, shall continue in the usual course and manner, with a view of increasing and building up the business as much as can reasonably be done, and that good faith and proper measures and methods shall be followed by the parties of the first part to keep the business and good will of the present customers of the Schilling Grain Company pending the consummation of the transfer of said property and business.

It is agreed that if any additional machinery, furniture, fixtures, horses, wagons, or equipment of any kind is purchased by the Schilling Grain Company between April 30th and October 1st, 1920, then parties of the second part agree to take the same over at market value October 1st, 1920, or the parties of the first part will keep same as later agreed upon, it being understood that the present equipment, machinery, etc., shall be kept in a good state of repair by the parties of the first part up to October 1st, 1920.

11340°—28——69

It is further agreed that upon the delivery of possession of the property herein mentioned to the parties of the second part, together with proper instruments of conveyance and transfer, then said parties of the second part will execute and deliver to the Schilling Grain Company their mortgage on the real property and chattel mortgage on the personal property to secure their promissory notes for the unpaid portion of said purchase price, which notes shall bear interest at the rate of six per cent per annum from date of October 1st, 1920, and shall be negotiable in form.

The restraint on H. J. Schilling and the Schilling Grain Co. entering into the wholesale or retail feed and seed business in Jackson and Clay County, Missouri, and Wyandotte County, Kansas, was limited to a period of two years from the date of the transfer of the property, for the reason that the purchasers thought that in that time they could permanently retain the customers of the vendors.

In accordance with the foregoing contract the purchasers paid the first installment of $5,000 on June 1, 1920. On June 28, 1920, all of the shareholders and directors of the Schilling Grain Co. having previously discussed the matter among themselves, met and formally authorized the sale of the property and said business. The minutes of the meeting of the directors held on June 30, 1920, were as follows:

KANSAS CITY, Mo., *June 30, 1920.*

At a special meeting of the directors of the Schilling Grain Co. held on the above date there were present H. J. Schilling, Pres. M. S. Railey, V. Pres. and B. O. Schilling, Sec. & Treas. representing all of the shares of the Corporation. This meeting was called to approve the steps which had already been made in connection with the sale of a part of the Capital Assets of the Corporation, and to authorize the payment to H. J. Schilling or through him a sum not to exceed Five thousand dollars ($5,000) in commissions for making this sale.

(Signed)        H. J. SCHILLING, *Pres.*
(Signed)        B. O. SCHILLING, *Sec'y & Treas.*

H. J. Schilling was paid $4,500 as commissions for negotiating and consummating the sale. This amount was taken as a deduction by the petitioner in its income and profits-tax return and allowed by the respondent in his determination of the deficiency involved herein. The petitioner's income was computed and its return filed on the accrual basis.

On July 1, 1920, V. R. Miller, one of the purchasers, was taken into the office of the Schilling Grain Co., where for three months prior to the date of the transfer, October 1, 1920, he was given a desk and paid a salary of $200 per month by the company. During the three months he was perfecting his organization, familiarizing himself with the company's business and was being taken around personally by Schilling and introduced to the customers of the company. During the three months the purchasers of the business were permitted to and did circularize the petitioner's customers and others

with notices and advertisements of a change of ownership by a circular entitled "Announcing—An Old Business Under a New Name," and which reads in part as follows: " Miller-McConnel Grain Company Wishes to Announce The Purchase of the Plant, Equipment, and General Grain and Feed Business of the Schilling Grain Company." At the time of the sale of the business the petitioner had very few hay transactions and after the sale had none of importance.

On October 1, 1920, the petitioner transferred to the Miller-McConnel Grain Co., which had been incorporated during the preceding September, all of the property described in the contract of May 19, 1920, except a horse which had died in the meantime. Some additional equipment acquired subsequent to the making of the contract, together with a list of petitioner's customers, was also transferred. The total purchase price was $30,638.81, the petitioner taking notes and mortgages for the deferred payments. The Miller-McConnel Grain Co. thereupon took over the petitioner's entire organization and employees except one man who was discharged. Immediately after taking over the business the Miller-McConnel Grain Co. found it necessary on account of insufficient finances to discontinue selling to certain former customers of the petitioner whose accounts were large and very profitable.

After the sale, Schilling, acting under an agreement with Miller, had a desk placed in the office of the Miller-McConnel Grain Co., which he used for six or seven months, during which time he advised with Miller in regard to the conduct of the business and as to what he should buy. Schilling had no connection with or interest in the new firm, except to see that it paid the balance of the purchase money.

After October 1, 1920, Schilling, using his membership in the board of trade, began transacting a commission business on the floor of the board, buying for the Miller-McConnel Grain Co. and for two or three other customers that he had previously obtained. In conducting the commission business Schilling neither bought nor sold grain either for himself or for the Schilling Grain Co., but acting for the Schilling Grain Co., bought for others and in their names for a commission. When Schilling left the office of the Miller-McConnel Grain Co. he moved into an office in the Board of Trade Building. At that time he had no organization or equipment except a desk. From the date of the delivery of its business and property to the Miller-McConnel Grain Co., the petitioner had no feed business nor did it buy grain for itself for resale in either wholesale or retail. It did not have any warehouse, wagons, teams, and machinery, nor did it grind feed, but only carried on a commission business as agent on the board of trade, buying for others and in their names for commission.

The Miller-McConnel Grain Co. continued to carry on the feed business taken over from the petitioner until it failed and quit business in the early part of 1926. The last of the purchase price was not collected by the petitioner until about March, 1927.

The petitioner continued its commission business for a few months after the failure of the Miller-McConnel Grain Co., when, having lost its best customer and its business being about gone, Schilling sold his membership on the board of trade and went to California. The petitioner is not now in business and its corporate existence is being maintained only until the disposition of this proceeding.

The petitioner's balance sheets as at the dates indicated show the following:

### NOVEMBER 1, 1907.

| RESOURCES | | LIABILITIES | |
|---|---|---|---|
| Equipment | $6, 094. 20 | Bills payable | $3, 000. 00 |
| Accounts receivable | 26, 423. 49 | Accounts payable | 1, 235. 62 |
| Membership, Board of Trade and Hay Assn | 510. 00 | Merchandise | 5, 333. 73 |
| | | Expense | 288. 38 |
| Cash on hand | 1, 693. 57 | Stock account | 10, 000. 00 |
| Ewing Street property | 5, 700. 00 | Reserve account and profits | 21, 052. 03 |
| Merchandise | 393. 50 | | |
| Expense | 95. 00 | | 40, 909. 76 |
| | 40, 909. 76 | | |

### NOVEMBER 1, 1908.

| RESOURCES | | LIABILITIES | |
|---|---|---|---|
| Equipment | $6, 490. 60 | Merchandise | $3, 363. 01 |
| Accounts receivable | 24, 151. 05 | Expense | 164. 88 |
| Ewing Street property | 5, 700. 00 | Bills payable | 3, 000. 00 |
| Membership accounts, Board of Trade and Hay Assn | 510. 00 | Accounts payable | 3, 660. 48 |
| | | Stock account | 10, 000. 00 |
| Cash on hand | 2, 062. 77 | Reserve account and profits | 23, 417. 16 |
| Expense | 166. 00 | | |
| Merchandise | 4, 505. 11 | | 43, 605. 53 |
| Bills receivable | 20. 00 | | |
| | 43, 605. 53 | | |

### JANUARY 1, 1910.

| RESOURCES | | LIABILITIES | |
|---|---|---|---|
| Equipment | $6, 109. 45 | Merchandise | $3, 043. 41 |
| Accounts receivable | 23, 734. 93 | Accounts payable | 1, 892. 81 |
| Ewing Street property | 10, 170. 00 | Bills payable | 3, 000. 00 |
| Membership accounts, Board of Trade and Hay Assn | 2, 525. 00 | Expense | 168. 00 |
| Merchandise | 5, 509. 11 | Stock accounts | 10, 000. 00 |
| Bills receivable | 15. 00 | Reserve account | 32, 211. 54 |
| Cash on hand | 2, 152. 27 | | |
| Expense | 100. 00 | | 50, 315. 76 |
| | 50, 315. 76 | | |

## January 1, 1911.

| RESOURCES | | LIABILITIES | |
|---|---|---|---|
| Equipment | $5, 906. 70 | Bills payable | $4, 500. 00 |
| Accounts receivable | 28, 894. 37 | Accounts payable | 3, 524. 82 |
| Cash on hand and safety deposit | 2, 309. 86 | Merchandise | 3, 202. 46 |
| Ewing Street property | 10, 170. 00 | Expense | 252. 40 |
| Chop and barley mill | 1, 812. 55 | Stock accounts | 10, 000. 00 |
| Stocks | 130. 00 | Reserve account | 36, 720. 00 |
| Membership, Board of Trade and Hay Assn | 2, 525. 00 | | 58, 200. 48 |
| Merchandise | 6, 367. 00 | | |
| Expense | 85. 00 | | |
| | 58, 200. 48 | | |

## January 1, 1912.

| RESOURCES | | LIABILITIES | |
|---|---|---|---|
| Equipment | $5, 885. 80 | Merchandise | $5, 575. 91 |
| Merchandise | 6, 756. 39 | Expense | 397. 05 |
| Accounts receivable | 37, 292. 80 | Bills payable | 4, 500. 00 |
| Membership accounts, Board of Trade and Hay Assn | 2, 525. 00 | Interest account | 112. 00 |
| Cash | 1, 165. 67 | Accounts payable | 5, 779. 17 |
| Ewing Street property | 10, 170. 00 | Stock accounts | 10, 000. 00 |
| Chop and barley mills | 1, 400. 00 | Reserve account | 39, 303. 89 |
| Stock accounts | 170. 00 | | 65, 668. 02 |
| Expense | 215. 00 | | |
| Advances on consignments | 87. 36 | | |
| | 65, 668. 02 | | |

## January 1, 1913.

| RESOURCES | | LIABILITIES | |
|---|---|---|---|
| Equipment | $5, 873. 75 | Merchandise | $3, 812. 69 |
| Membership accounts, Board of Trade and Hay Assn | 2, 525. 00 | Expense | 372. 87 |
| Accounts receivable | 32, 194. 46 | Accounts payable | 1, 281. 25 |
| Merchandise | 6, 095. 41 | Stock accounts | 10, 000. 00 |
| Building account | 1, 156. 85 | Reserve account | 43, 676. 60 |
| Ewing Street property | 10, 170. 00 | | 59, 143. 41 |
| Cash | 572. 94 | | |
| Advanced on consignments | 425. 00 | | |
| Expense | 130. 00 | | |
| | 59, 143. 41 | | |

The following is a statement of petitioner's surplus, profits, and dividends paid from December 31, 1907, to December 31, 1919:

|  | Profits, per books | Dividends paid |
|---|---|---|
| Balance December 31, 1907 | | $21,011.18 |
| Profits year 1908 | $3,005.31 | 3,005.31 |
| Balance Dec. 31, 1908 | | 24,016.49 |
| Profits year 1909 and dividend paid | 3,264.20 | $2,000.00 | 1,264.20 |
| Appreciation of real estate and memberships | | | 6,930.85 |
| Balance Dec. 31, 1909 | | 32,211.54 |
| Profits year 1910 | 4,509.26 | 4,509.26 |
| Balance Dec. 31, 1910 | | 36,720.80 |
| Profits year 1911 and dividends paid | 4,983.09 | 2,400.00 | 2,583.09 |
| Balance Dec. 31, 1911 | | 39,303.89 |
| Profits year 1912 and dividends paid | 6,772.71 | 2,400.00 | 4,372.71 |
| Balance Dec. 31, 1912 | | 43,676.60 |
| Profits year 1913 and dividends paid | 7,369.03 | 13,200.00 | (5,830.97) |
| Balance Dec. 31, 1913 | | 37,845.63 |
| Profits year 1914 and dividends paid | 8,556.26 | 1,200.00 | 7,356.26 |
| Balance Dec. 31, 1914 | | 45,201.89 |
| Profits year 1915 and dividends paid | 4,745.24 | 8,000.00 | (3,254.76) |
| Balance Dec. 31, 1915 | | 41,947.13 |
| Profits year 1916 and dividends paid | 3,348.37 | 2,400.00 | 948.37 |
| Balance Dec. 31, 1916 | | 42,895.50 |
| Profits year 1917 and dividends paid | 3,511.69 | 2,400.00 | 1,111.69 |
| Balance Dec. 31, 1917 | | 44,007.19 |
| Profits year 1918 and dividends paid | 7,136.50 | 2,400.00 | 4,736.50 |
| Balance Dec. 31, 1918 | | 48,743.69 |
| Profits year 1919 and dividends paid | 9,745.18 | 3,600.00 | 6,145.18 |
| Adjustment of inventory | (1,690.00) | | (1,690.00) |
| Balance Dec. 31, 1919 | | 53,198.87 |

In its income and profits-tax return the petitioner took a deduction of $5,600.36 as a loss sustained in the sale of its assets, computed as follows:

| Kind of property | Date acquired | Cost or value at Mar. 1, 1913 | Depreciation | Depreciated value |
|---|---|---|---|---|
| Mill and elevator equipment | Various | $8,287.43 | $2,891.99 | $5,395.44 |
| Office furniture and fixtures | do | 970.38 | 211.15 | 759.23 |
| Stable | do | 330.00 | 98.60 | 231.40 |
| Ford trucks | 1918 | 693.99 | | |
| Wagons and harness | Various | 1,348.50 | 1,394.99 | 2,792.50 |
| Teams | do | 2,145.00 | | |
| Real estate | 1905 | 12,000.00 | | 12,000.00 |
| Good will | | 10,560.60 | | 10,560.60 |
| | | 36,335.90 | 4,596.73 | 31,739.17 |
| Value of assets as above | | | | 31,739.17 |
| Sale price of above assets | | | 30,638.81 | |
| Less payment to H. J. Schilling as per contract | | | 4,500.00 | 26,138.81 |
| | | | | 5,600.36 |

The value at March 1, 1913, of the good will was computed by the petitioner as follows:

|  | Profits | Net tangible assets |
|---|---|---|
| 1908 | $3,005.31 | $31,052.03 |
| 1909 | 3,264.20 | 34,057.34 |
| 1910 | 4,509.26 | 35,321.54 |
| 1911 | 4,983.09 | 39,830.80 |
| 1912 | 6,772.71 | 42,413.89 |
|  | 22,534.57 | 182,675.60 |
| Average profits | | 4,506.91 |
| Average tangible assets | | 36,535.20 |
| Average profits for five years as above | | 4,506.91 |
| Return of 8% on average tangible assets | | 2,922.82 |
| Average amount available for return upon value of intangible assets | | 1,584.09 |
| Amount available for return upon intangibles capitalized at 15%—Amount applicable to good will | | 10,560.60 |

In an audit of the return, respondent reduced the March 1, 1913, value of the assets by $10,560.60 representing the value of good will.

OPINION.

TRAMMELL: The petitioner contends that the respondent erred in disallowing the March 1, 1913, value of good will claimed in its return in determining the loss on assets which it sold to the Miller-McConnel Grain Co. during 1920. The petitioner also contends that the deduction of $4,500 taken in its return as a commission was properly allowed in the determination of the deficiency.

The respondent denies that any error was committed and contends that the good will had no value on March 1, 1913; that whatever good will the petitioner had on that date had not cost anything; that it was not properly a part of the cost of the assets sold, and that as a matter of law the good will could not under the facts in this case have been transferred to the Miller-McConnel Grain Co., since the petitioner continued in business. The respondent also contends that the facts in regard to the deduction of $4,500 paid Schilling by the petitioner as a commission for negotiating and consummating the sale of the petitioner's assets and business are insufficient to warrant the allowance of the item.

In regard to the deduction of $4,500 taken by the petitioner and which was allowed in the determination of the deficiency involved herein, the respondent by an amendment to his answer filed at the hearing alleges that the allowance of this deduction by him was erroneous. The burden of proving this allegation is upon the respondent and unless it is shown by a preponderance of the evidence that his allowance was erroneous, we would not be justified in chang-

ing his previous action. In support of this deduction the petitioner submitted evidence showing that on June 30, 1920, its directors, who were also all of its stockholders authorized the payment of a commission not exceeding $5,000 to Schilling for his services in making the sale; and that $4,500 was actually paid to Schilling for his services in consummating the sale. The respondent introduced no witnesses nor did he develop from the petitioner's witnesses any evidence to support his allegation that his allowance of the deduction was erroneous. Therefore, we hold that the deduction of $4,500 is allowable.

The petitioner's other contention relates to the disallowance of the amount of $10,560.60 claimed in its return as representing the value on March 1, 1913, of the good will which it sold to the Miller-McConnel Grain Co.

In support of the contention that its good will had a value of $10,560.60 on March 1, 1913, the petitioner introduced in evidence its balance sheets and a statement of its surplus, profits and dividends as set out in our findings. From a careful consideration of these in connection with the other evidence in the case, we are of the opinion that the petitioner's good will had a value of $10,000 on March 1, 1913.

On May 19, 1920, the petitioner and H. J. Schilling contracted to sell the petitioner's lands, buildings, lease, mill, machinery, elevator equipment, office and delivery equipment, together with other property, including its good will, and agreed not to enter into the wholesale or retail feed and seed business in Jackson and Clay Counties, Missouri, and Wyandotte County, Kansas, for a period of two years from the date of the transfer of the above-mentioned property. The evidence shows that the petitioner transferred its physical assets to the purchasers and there is no controversy as to this, but the respondent contends that under the circumstances in this case as a matter of law the petitioner did not transfer its good will.

The respondent's contention is based upon the conclusion that, as the purchasers were not given the right to use the petitioner's name and as the petitioner under the contract was prohibited from engaging in the wholesale and retail feed and seed business for only a period of two years, the petitioner retained its good will. We do not agree with the respondent's contention on either of the points raised.

In *Piggly Wiggly Corporation* v. *Saunders*, 1 Fed. (2d) 572, it was contended that Saunders, who had sold his business and certain other assets, including good will, had as a result of such sale conveyed to the vendee corporation the right to the use of his name. There the court said:

> While one may, if he so desire, convey to another the use of his name (*Royal Baking Powder Co.* v. *Royal*, 122 Fed. 337, 58 C. C. A. 499; *Kidd* v.

*Johnson*, 100 U. S. 617, 25 L. Ed. 769; *Donnell* v. *Herring-Hall-Marvin Safe Co.*, 208 U. S. 267, 28 Sup. Ct. 288, 52 L. Ed. 481, and authorities cited in these cases; *Frazer* v. *Frazer, etc., Co.* 121 Ill. 147, 13 N. E. 639, 2 Am. St. Rep. 73, and authorities cited; *Goldwyn Pictures Cor.* v. *Goldwyn*, 296 Fed. 391 [U. S. Cir. Ct. App. Sec. Cir., decided Jan. 7, 1924], yet in the absence of an express provision in a contract so showing it would seem one will not be held to have conveyed his name or parted with the right to use it in business, even though he may have sold a business, together with the good will incident thereto.

As to the restraint against the petitioner reentering the feed and hay business, we are convinced that it did not prevent the petitioner from transferring its good will. Unless the contract of sale had contained some reasonable limitation as to the petitioner reentering its former business, there would have been nothing to prevent the petitioner from immediately competing with its vendee. In *Piggly Wiggly Corporation* v. *Saunders, supra,* it was said:

Between the two rules mentioned the weight of authority seems to be that, in the absence of an express contract not to re-engage in business, the vendor of a business and the good will thereof is not precluded from again engaging in competitive trade, provided he shall do no wrongful thing or be guilty of no wrongful intentional act to seek to draw from the old business its customers, or shall not engage in such business as that the vending of its wares or merchandise would fall within the rule governing unfair competition. *Knoedler* v. *Glaenzer, supra,* and authorities therein cited.

In *Counts* v. *Medley*, 163 Mo. App. 546; 146 S. W. 465, the court said:

While the general rule is, that in the absence of an express agreement, the sale of a mercantile business, together with the good will thereof, does not import an agreement by the vendor not again to engage in a competing business, yet where the vendor expressly agrees not to engage in the same business at the same place for a specific time, or so long as the buyer continues in business, the obvious intention is to sell the good will of the business. (*Shafer* v. *Sloan*, 3 Cal. App. 335, 85 Pac. 162.)

We have found that the petitioner corporation took one of the purchasers of its assets into its office three months before the transfer of the assets, gave him a desk, familiarized him with the business, introduced him to its customers and during this time permitted him to circularize them with notices and an advertisement announcing the purchase of the business. This same purchaser testified that the restraint placed in the contract of sale was made for two years for the reason that the purchasers thought that whatever good will of the petitioner they could not retain after two years they would never be able to retain.

In view of the foregoing, we are of the opinion that the petitioner sold and transferred to its vendee its good will which on March 1, 1913, had a value of $10,000.

The March 1, 1913, value of the assets sold should include this amount representing such good will. *Appeal of Henry F. McCreery*, 4 B. T. A. 967. If, when this amount is added to the March 1, 1913, value of the assets sold, the amount exceeds the cost of the assets, the deductible loss is the difference between the cost and the selling price. *United States* v. *Flannery*, 268 U. S. 98; *McCaughn* v. *Ludington*, 268 U. S. 106. The cost of the assets was not in dispute and no issue was raised with respect thereto.

Reviewed by the Board.

*Judgment will be entered on 15 days' notice, under Rule 50.*